Good morning, Your Honors. My name is Deborah Jennings. I'm accompanied by my co-co-co-governor Ronnie Musgrove. Together, we represent 16 Front Street, L.L.C., which is an affiliate of Globe Metallurgical, and Globe is a competitor of MS Silicon. However, we also represent C. Richard Cotton, who is an individual, a freelance writer, who lives in the vicinity of this plant, and who will be breathing the air that will be degraded by 6,500 tons of Clean Air Act-regulated pollutants. The operative principle in this case is one of cooperative federalism. Most states, not all, but most states, including Mississippi, have requested the authority to implement the prevention of significant deterioration part of the Clean Air Act. And in so doing, they undertake this compact with the federal government, where the state is the primary implementer, meaning that they take the federal principles prescribed by the Clean Air Act and federal regulations, and apply them to individual applicants and issue permits. So the states that are approved, what we call approved under the state implementation plan, are the primary implementers in the sense that they write the permits. However, their authority is totally dependent on their following the mandates of the federal law. That is the cooperative federalism and the compact that is made by states like Mississippi. In this case, what happened is that MDEQ literally became a private club with the applicant, and that's clearly evidenced in the email trail. We mentioned a few things from the record. But when the permit writer says on the third day of receiving a huge notebook containing the application that her primary mission is to close out the comments so as to allow a final permit for financing, when the environmental permit writer says that on the third day, I think it says it all. And finally, when the comment period closed after hours on a Friday evening, she sends a text to MS Silicon's representative saying, okay, we'll issue the permit Wednesday. Highly irregular conduct, and I think it demonstrates that what really happened here is that they became a club and they forgot about the public interest. Now, when Congress enacted Part C of Title I, which is the part that deals with PSD permits, they begin that section with a very clear declaration of purpose. They have five key purposes, some obvious, protect the public health, prevent degradation of the air, protect the public parks. I mean, these are the overarching purposes. And the fifth purpose, this is in 160 section 5, the fifth overriding purpose is to assure that a decision to permit increased air pollution is made only after adequate procedural opportunities for informed public participation. And that's exactly what did not happen here. MDEQ, in its rush to judgment to get that permit out the door and get the financing done, toward the end of jobs, an understandable purpose, but not the right purpose for an environmental regulator. To get that permit out and the financing done, they forgot about their duties to the public. So the overarching issue here, Your Honors, is whether a Federal Court has jurisdiction to enforce the preconditions to the issuance of a PSD permit prescribed by Congress in their effort to assure that there would be national uniformity in the prevention of significant deterioration permit cases. So I'd like to step back before really delving into that and just make two observations, partly because you may not see Clean Air Act cases all the time, but one observation is this case does not involve Title V operating permits. Title V of the Clean Air Act is a totally different area. This is a Title I construction permit case. The reason I bring that to your attention is that you were sent by letter a copy of the case from Arkansas, Nucor Steel, and in that case, Arkansas, like only a few states, has brought PSD within the Title V provisions and therefore the Title V appeal apparatus controls. So this is not a Title V case. Mississippi has not done that, just like Texas has not done that. Most states have not done that, but Arkansas has. So the Title V cases are inapposite. The second observation I would make is that this is a case where we are challenging the legitimacy of the PSD, the so-called PSD permit, because the state agency failed to follow the preconditions that are set out in Section 165A2-8, the preconditions to the issuance of a permit. Those preconditions tell a state agency how they evaluate the application. They do not tell the agency what permit terms to issue. The latter is within the expertise of the state agency in the exercise of their discretion, but the former is the set of criteria mandated by Congress for the analysis of the PSD permit. And what regulation, what statute allows this Court to review those, whether those preconditions have been met or not? Well, we believe it's 304A3, the citizen suit provision, Your Honor. And where does it say that? Well, what it says is that construction may not occur without a permit required by Part C, and Part C is where 165A2-8 reside. Plus, the Supreme Court of the United States has said just that. In the Alaska case that we cite, they say 165A2-8 are preconditions to the issuance of a PSD permit. So we would submit, Your Honor, you cannot, in a cooperative federalism system, have the state show through its regulations that it's going to adopt the Clean Air Act mandates and then forget about them in the course of implementing them. That cannot be the law. So there are requirements meant for national uniformity in 165A2-8 where the Supreme Court of the United States in the Alaska DEC case said they are preconditions to the issuance of a PSD permit. So if you don't meet those preconditions, you don't have a PSD permit. That's our contention, Your Honor, through 304A3. Now, in the Alaska case, that is a case where the state, like Mississippi, was SIP-approved, meaning they had applied for PSD authority. They were the primary implementers of the PSD permit, just like Mississippi. And in that case, the state agency issued a document that it called a PSD permit, just like we have here now. And what EPA said in that case was, wait a minute, you left out 165A4, the demonstration that you have the necessary control technology. That was omitted. And so that is not a PSD permit. That's what EPA said. They issued an administrative stop work order, and the Supreme Court of the United States said they were correct, because 165A2-8, all of those conditions are preconditions to the issuance of a PSD permit. And in the words of the Supreme Court, we've been very careful to quote the exact words, absent compliance with these, construction may not occur. So they are prerequisites. So what happened here is Mississippi just completely ignored 165A2. And A2 is the one that requires them to follow the EPA regulations, the requirements of the EPA regulations and their analysis, and provide public opportunities. Now this Court in the Clean Coalition case, which is a matter of great dispute, also says that 165A provides, and I quote, pre-construction requirements that are preconditions, preconditions for granting a pre-construction permit. And that's at page 477. Those are the exact words of this Court in that Clean Coalition case. So Clean Coalition, although it doesn't refer to the Alaska case for that principle, cites exactly the same principle. 165A2-8 are preconditions for the issuance of a PSD permit. Now my opponents would say, well, that was EPA. You're a citizen. You're different. First of all, preconditions are preconditions are preconditions. There's no difference there. There's no reason why that should be any different. Secondly, the provision that EPA was relying on allows them to sue the owner of a facility when the state has not followed its own rules, its own SIP rules that are meant to implement the Clean Air Act. That's what EPA was relying on in Alaska. And what we're saying under 304A3 is that we want to sue the owner of the facility because the state utterly ignored the mandates of 165A2, which are, is a precondition to their authority to issue a PSD permit. Let me ask you a question. What exactly is the status or the relationship of 16 Front Street? What is that? It's an entity that bought a piece of property, Your Honor. That's it. Yeah, but what's it interested in? What's its job? Is it a competitor with the silicone? Well, it is not, but one of its affiliates is. Yes, they're correct about that. Mr. Cotton, however, has no relationship whatsoever. He's just a citizen who lives in the vicinity of the Burnsville area. So there is an affidavit in the record that talks at length about him. He's a freelance writer. He travels to Chemehue County. Right, but I wasn't, I understand his status. I just wasn't sure what 16 Front Street really was and what the interest is in trying to get the injunction. Well, it's a single-purpose entity that owns a piece of property in the area, but it is And what does it do with that piece of property? It just owns it, and they may rent it from time to time. That's a little suspect, I think. Yeah, I don't know the details, Your Honor. They may rent it, but they own a piece of property. That's all I know. Well, what are they going to do with the piece of property? You don't just own things. You either rent them, or you make a business, or you make a residence. You know, I don't know the answer to that. I'd be happy to provide it to the court, but they have talked about renting it. I've heard them talk about that. Whether they have or not, I don't know. Okay. Now, the trial court in this case held, and this is in footnote 21 of the opinion, that 165A.2 through 8 are not preconditions to the issuance of a PSD. That is plainly wrong and contrary to what the Supreme Court of the United States said and contrary to what this Court said in Clean Coalition, and my opponents don't defend that position of the trial court in footnote 21. Rather, what my opposition relies on is citing language in the Clean Coalition case that says that 304A.3 means that you can bring suit when someone has no permit whatsoever, and they would interpret that very broadly. But, of course, that's not what the statute says. The statute says no permit, without a permit required by Part C. That's what the Fifth Circuit said. Yes. Without — We are bound by that. Well, the Fifth Circuit is adopting the trial court's language, but what I would say, what I would suggest to Your Honor, is that they have to mean what the statute says. It's hard to imagine that the Fifth Circuit, in that opinion, means to broaden what the statute requires, which is a permit required by Part C. So the Fifth Circuit has to mean that. But that wasn't the holding, really, of that case. That case and all of its progeny is cited for the proposition that when you bring a citizen in that case against an application for a permit, as opposed to a permit, it isn't ripe. And that's what all of the subsequent cases have looked at Clean Coalition as standing for. So let me talk just very briefly about what happened here. They were required, MDEQ was required to put the entire application, which has all of the air impacts, all of the technology, pollution control technology analysis, et cetera, in the county where the facility is going to be built. They put nothing there. And this was their regulation required it, the Federal regulation required it, required that it all be there to provide an informed opportunity for the public. None of it went there. It was placed 243 miles away at MDEQ's headquarters, available only, and this is right in the advertisement, only through FOIA, which has at least a minimum of a 14-day delay. So they totally violated that provision. There's no question about it. They ran an ad for, all they put there was their own draft permit and their own analysis. That was it. They ran an ad saying you would have 30 days and then they only gave 29. And what they did put there, they didn't put until five days after they ran the ad, so effectively there were only 29. There's an avenue of appeal to state courts to remedy that, right? Well, the state court appeal opportunity is to challenge the permit terms, and that's exclusive in my view. That would be a collateral appeal. What we're challenging is MDEQ's failure to comply with the Clean Air Act mandates in 165A2. And by the way, the Supreme Court of the United States said in Alaska it was not necessary for EPA to go to the state courts. Well, that's EPA. I'm just asking, and I'm not suggesting there's an exhaustion. I just want to know, is there a state remedy? Is there a right to go into court to challenge the notice provisions that it was not properly permitted? I think if you wanted to go to state court to argue that the federally mandated national consistency guidelines were violated by Mississippi in its zeal to obtain jobs, you could do so. But I don't think that means that a Federal court can't hear the case. So for all of those reasons, Your Honor, and also the Supreme Court's reference to the potential for environmental economic blackmail and the need for national guidelines, we ask this Court to find that there is jurisdiction to vindicate 165A2. All right. Thank you. Thank you. Mr. Delacroix. May it please the Court, my name is Mark Delacroix, and I'll be arguing on behalf of Mississippi Silicon. I'm here for 15 minutes, and I'll address the appellant's Section 304A3 claim against Mississippi Silicon, and I'm also available to answer questions about our argument that the appellants lack standing to appeal the District Court's subsequent order dismissing the claims against Mississippi Department of Environmental Quality. Ms. Hodges from Mississippi Department of Environmental Quality will address the time of filing rule. Your Honor, Ms. Jennings made a variety of statements about the merits of this case, but we're here on an appeal of a decision dismissing for lack of subject matter jurisdiction. And I think that the Eighth Circuit said it best in a suit called Nucor Steel Arkansas v. Big River Steel, Queen Coalition has already decided the issue of whether a party can run into federal court under Section 304A3 to challenge a PSD permit that a state has issued. There is no meaningful distinction between that aspect of the Queen Coalition, excuse me, of the Big River Steel decision and Queen Coalition. Big River Steel was a very similar suit where a competitor decided that Section 304A3 was the right way to try to stop a competitor from constructing. Although there were 27 claims in the Big River Steel case, some of them were very similar to this. There was an argument that Big River Steel submitted comments at the end of the permitting process and that prejudiced the public's ability to participate. That was count 19 in Big River Steel. There were allegations that the state was colluding with Big River Steel in the permitting process. That was claim 26 in the Big River Steel case. It was almost identical case. When that court, the Eighth Circuit, looked at this court's decision in Queen Coalition, it said the Fifth Circuit has decided this issue already. You can't go to court and challenge under Section 304A3 construction under a PSD permit. So I'll turn now to Queen Coalition and Section 304A3. What the court in Queen Coalition said, and I heard my colleague quote the Alaska Department of Environmental Conservation case, which is not a Clean Air Act citizen suit case and does not interpret Section 304A3, but Queen Coalition does. And what it says is, quote, the district court interpreted that section, i.e. Section 304A3, as authorizing citizen suits when an entity proposes to construct or constructs a facility without a permit whatsoever. We agree with the district court's with the Clean Air Act. However, we declined to rewrite the plain language of the statute. I simply don't see any way you read that language as authorizing appellants to challenge Mississippi Silicon's state-issued PSD permit through a Section 304A3 citizen suit. Appellants had the opportunity to bring a challenge before the permit board of the And notably in their complaint, they do not allege that they couldn't do that. They had the opportunity to do that. They chose not to. And so the state exhaustion, while this is not an exhaustion case, I think it is relevant in interpreting Section 304A3 and what Congress meant with without a permit required under Part C in light of the fact that Congress understood that there was a state avenue for appeal. As I see it, there really are two distinctions that the appellants have offered for Clean Coalition. The first distinction is the substance versus procedure decision. They said, well, Clean Coalition was challenging the substance of a permit application and we're challenging the state's compliance with procedure. In the district court, they conceded that there was no difference in the way the Clean Air Act treats substantive and procedural challenges. And that's at record page 1095. If there's going to be a principled distinction between this case and Clean Coalition, you need to draw it from the statute. It can't be like saying the comparative negligence rule may apply to automobile accidents but not motorcycle accidents. You need a principled basis that comes from the statute. There's no principled basis that comes from the substance versus procedural section. All of the requirements, substantive and procedural, are from Section 165A as implemented through state implementation plans, substantive and procedural. There's no distinction there. The second distinction that the appellants have attempted to draw comes from the fact that Clean Coalition considered an application, a challenge to a permit application, versus a challenge to a facility that's already been constructed. And I think here it's important to go to Section 304A.3 to show why that difference just can't matter. Section 304A.3 allows a suit, and I'm going to begin the quote here, against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under Part C. And I'll end there, but it goes on further. Clean Coalition was based on a proposal to construct theory. The defendant in that case was proposing to construct a coal-fired power plant through the submission of an application. We have already been through that process and are now constructing, but there's no difference in the way Section 304A.3 treats a claim based on proposal to construct or construction. The limiting phrase in both is without a permit required under Part C. It may be a distinction, but it's not a principle distinction. It's not one that matters. And I think it's also notable that while the appellants cast Clean Coalition as a substance case, it's far from clear that that's true. In the district court, at Star 33 of the unreported decision, the district court said that this was essentially a collateral attack on the Texas permitting process. That's what we have here. In the Clean Coalition decision, it's interesting that the court relied on an unreported Ninth Circuit decision called Heisen v. Pacific Coast Building Products. And in the parenthetical citation to that, they said that the Ninth Circuit was, quote, rejecting attempt to utilize Section 304A.3 to collaterally attack issuance of permit of alleging that facility submitted fraudulent information to obtain it. So the Clean Coalition court wasn't just interested in whether you were attacking the terms of a permit. It relied on cases attacking the issuance of a permit. And it's hard for me to see any way this case isn't a challenge to the issuance of Mississippi Silicon's permit. Finally — I contend there's no distinction between the initial issuance of the permit, the application as opposed to the construction. Not as Section 304A.3 treats them. Now, there are two claims in Clean Coalition, Section 304A.1, which is not at issue against Mississippi Silicon in this case. And the Clean Coalition court had an extensive discussion about how a challenge to a permit application might fit into that statutory scheme under Section 304A.1, a different statute. It concluded that it didn't. However, when the Clean Coalition court got to Section 304A.3, the second claim in Clean Coalition and the only claim against Mississippi Silicon in this case, I mean, frankly, the court disposed of it in one short paragraph. It said a permit does not mean — a permit acquired under Part C does not mean a permit that complies with the Clean Air Act. It means a permit whatsoever. I'd like to turn to the Alaska Department of Environmental Conservation case. Again, not a Section 304A.3 case, to show why Congress gave EPA more authority than it did citizen plaintiffs under Section 304A.3. Alaska Department of Environmental Conservation concerned what's called the Red Dog Mine in Alaska. It's the largest zinc mine in the world, and they were putting five very large diesel generators in there. When Alaska wrote the permit for that facility, there was a dispute within the Alaska agency about whether to require one control technology or the other. EPA ultimately, at the end of that process, said you did not provide a sufficiently reasoned explanation about why you chose the less expensive pollution control technology. And EPA said — did two things. It said there's a stop work order for the company building the mine, and it said that it would sue under its enforcement authority. The first statute that EPA relied on was Section 167 of the Act, 42 U.S.C. 7477. That statute says the administrator shall and a state may take such measures as necessary, including issuance of an order or seeking injunctive relief, as necessary to prevent the construction or modification of a major facility — major emitting facility which does not conform to the requirements of this part. Does not conform to the requirements of this part is far more expansive language than Section 304A.3, which refers only to a facility without a permit required under Part C. EPA was also acting under its Section 113A.5 authority. What that statute says is whenever, on the basis of any available information, the administrator finds that a state is not acting in compliance with any requirement or prohibition of the chapter is far broader language than you have in Section 304A.3, which refers only to the permit. And that's the point that the district court got to in its decision that we do agree with, when it said, what does Congress mean in Section 304A.3 when it says without a permit? And the district court looked to the PSD program, Sections 160 to 169 of the Act, and said, well, the permit requirement is the requirement in Section 165A.1. And in so interpreting it, agreed with the Queen Coalition Court, which said that it meant without a permit that complies with the Clean Air Act. In so doing, the district court reached the same conclusion. And I would note that the position that the appellants have asked you to take on Section 304A.3 would make this court, or strike that, the district court and other federal district courts around this country, the appellate court to review all state and all EPA permit decisions. The appellant, every challenge to a PSD permit that's brought in state agencies throughout the country, or before the Environmental Appeals Board, is that the facility of the state has in some way or another failed to comply with one of the requirements between Sections A.2 and Section A.8. Those are the claims brought in every single such case. In a recent rulemaking, EPA estimated that there are 700 PSD permits that are issued in this country each year. We cited that in the brief. Those are 700 potential suits for competitors, for the Sierra Club, and for others to bring to federal district court where they had an available state remedy. In fact, one could argue they may prefer to bring such a suit in federal court rather  But that's really our concern, is that, I mean, that's for Congress to decide. We just need to construe the statute, right? I agree, Your Honor. But in construing the statute, I think it's relevant that Congress recognized that there was a state administrative appeals, and that was in the Queen Coalition decision as well on pages 478. When looking to what did Congress mean with without a permit, it makes sense to consider whether Congress would have, through its without a permit language, intended to bring all those cases into federal court jurisdiction. And finally, I'd like to turn back to one question that you had, Judge Clement, on 16 Front Street and what 16 Front Street does. We don't know what it does other than sue Mississippi Silicon, but it is notable that 16 Front Street was formed approximately two weeks after the Mississippi Permit Board denied an appeal by Globe Metallurgical to the Mississippi Silicon permit. Globe Metallurgical decided not to submit any comments on Mississippi Silicon's permit, but it did file an untimely challenge in the Permit Board. The Permit Board refused that challenge, and that decision's been affirmed by two separate courts. But two weeks later, it formed 16 Front Street. Then it waited six months, filed this suit, and sought a temporary restraining order after sitting out the state process. Thank you. If you have any further questions. All right, Ms. Hodges, you have five minutes. Thank you, Your Honor. I'm Donna Hodges from the Mississippi Department of Environmental Quality. My co-counsel today is Lee Thames with the Mississippi Attorney General's Office, and we represent Gary Reichard in this matter. The issue, I will say, Your Honor, that I have long thought that there was nothing unique at this point in time that hadn't happened to people already. But as the briefs certainly demonstrated, and as you know, the law relevant to time of filing on the facts of this particular case is in bits and pieces and comes in fits and starts. So I'll start with the rule, the general rule, long-time rule that jurisdiction is determined at time of filing. The defendants have argued that that rule only applies in diversity cases and in rare federal question cases when removal is at issue. But that's not the case in this circuit. In this circuit, we've seen Whitmer v. Victus, which was an FMLA and ADA case, not removed. Smith v. Regional Transit Authority, an ERISA case, not removed. And Boland's, which was a Magnuson Moss question. All of those federal question cases where the court looked to time of filing to determine whether or not the court had original subject matter jurisdiction. So we submit that time of filing is the correct rule of law to apply in this case. Go ahead. Go ahead. What if 16 Front Street refiles the amended complaint in federal district court? They absolutely can do that. It was dismissed without prejudice. And that would be, that would give them jurisdiction? It was subject to the other defenses that we never got to in this case, Your Honor. But in fact, they could. And I'll point out that in the Grupo Dataflux case, that that was in very classic Scalia fashion address. And he said, look, you can't set aside jurisdiction for, you know, for a judicial economy. It's too important. You can refile. You can go settle. But you have that option. But the court does not have the option to extend jurisdiction where none exists. Scalia wrote two opinions, including that one. And I thought he was pretty clear and made a distinction about when the parties don't change. Then you were talking about the time of filing. But when parties change, he said that's always been an exception. I think, Your Honor, in this, in this jurisdiction, what we've seen is. Well, this is the U.S. Supreme Court. Right. And they were pretty clear, it seems to me. Well, the parties, the parties in this case that changed, well, first of all, the parties didn't change. The original complaint was filed against Mississippi Silicon. And that didn't change. Then there was a challenge to jurisdiction. So in response to a challenge to jurisdiction and a comment by the court, notably that MDEQ was absent, they amended the complaint to add new claims against new parties. That may not fix the claims against Mississippi Silicon, but it sure gets MDEQ, it seems to me, into the Supreme Court's precedence. I would say, Your Honor, that it gets them back to refiling against DEQ. That's not what the Supreme Court said. And I think that, as I understand it, Your Honor, that's, that's, you cannot, you cannot create retroactive jurisdiction. The distinction in this case is that there was that challenge to jurisdiction made, so the court had to look to it to determine if they had original jurisdiction. This court has said clearly, and in reliance on those same cases, we have, courts have rejected efforts to add new claims, new parties, reassert claims that were dismissed to create jurisdiction where none exists. And that's what we have in this case. The court didn't have original jurisdiction even by the amended complaint. It didn't change the allegations. They were the same jurisdictional allegations, not corrected, not to correct formal or technical allegations, but to create a new party and new claim. So, it would be our position, Your Honor, that this court, and as the court stated in the case that the court relied on, the N. Ray Katrina Canal breaches, as long as the changes in the allegations are of a technical or formal variety. That didn't involve a change in parties either. Most of the change in party cases are cases where they tried to change, actually change plaintiffs to bring in a plaintiff that would be, that would provide competence in the court, whereas the original plaintiff did not. And I understand that there are instances where the courts have denied the allowance of a new plaintiff to create competence. They've never allowed it to create competence where none exists to begin with. And that's, I think, in this case, the issue is that the jurisdiction was actually challenged prior to the amendment. The amendment didn't change the original jurisdiction or the jurisdictional allegations, even as amended. So the court simply didn't have jurisdiction. I'm sorry. That's my time. We have your argument. Thank you. All right, Ms. Jennings, you have 5 minutes for rebuttal. First of all, quickly on the New Court case cited by my opponent. As I mentioned in opening, that is in the Arkansas. Arkansas brings PSD within Title V. I was surprised to hear him say it was almost identical with this case. Mississippi does not bring PSD within Title V. And also, as you will see, Title V has a very elaborate appeal mechanism in the state and federal court. And so when they argued for 304A3 there, they were arguing for a third route of appeal. So New Court really is inapposite to this case. Now, our opponents try to recast our claim to make it fit Clean Coalition. But let me recount the ways that that's wrong. First of all, we are not challenging an application. And that was a challenge to an application in Clean Coalition. And by the way, the particular challenge had to do with the technology choices made by the state agency and with the modeling approved by the state agency, both of which resulted in permit terms. Permit terms. So those are peculiarly within the sound discretion of the state court and totally different from what we're talking about here. Secondly, we are not arguing that the permit fails to comply with the Clean Air Act. They want to say that because that's the language of Clean Coalition. But compliance with the Clean Air Act, as this Court pointed out in that case, was an earlier version. It was the House version of 304. And that was not adopted in the conference report. What was adopted is without a permit required under Part C. We do not argue that this is a permit that does not comply with the Clean Air Act. We just don't make that argument. What we're talking about is a state, a state that fails to comply with the Clean Air Act because they are participating in cooperative federalism. They are given a list of preconditions, according to this Court and the Supreme Court, that they must apply in the exercise of their discretion. And that's where they failed. They totally, utterly violated their own law and the mandates of the federal law. Totally and utterly? Totally and utterly, Your Honor. They put the application 243 miles away. I'm looking for the jury. I'm sorry. So thirdly, he says that he tries to make the distinction between substance and procedural. That's not what I said. What I said was the state failed to meet its obligations in how you analyze the PSD permit. This is a cooperative federalism case. And what we seek to do is vindicate, vindicate the mandates of Congress in the PSD program. So I think the key language in Clean Coalition is when they say, therefore, we decline to rewrite the plain language of the statute. And the plain language of the statute is not any permit whatsoever. The plain language of the statute is a permit required under Part C. And that's what we contend, Your Honor. This was not such a permit. Just as in Alaska, where they had not justified the control technology, they had an inexpensive one. They were anxious to lure the business and the jobs, where they were sorely needed in Alaska, so they skipped over the 165A4 requirements, just as in that case. In this case, MDEQ was unduly motivated to facilitate the closing. The environmental regulator wants to facilitate the closing, the financial closing, instead of doing what she should be doing, which is regulating. And that's a failure. And in so doing, by the way, it was just the two of them. The public had none of the things that they're guaranteed under 165A2 and federal regulation. Most importantly, the very thick application, which would allow the public to make their own judgments. That was not there and not available. So the last thing I want to mention quickly is the Alaska Authority. My opponent tries to make the argument that EPA has broader authority because they're vindicating any requirement of this chapter. But what he fails to notice is we're not just talking about 113A5 cited by him. We're also talking about 113B3. And so the any requirement is not comparing the permit to the Air Act. The any requirement is comparing the requirements that are placed on a state when it is given the authority to issue a permit to degrade the air. Those are the requirements, the requirements that apply to the state. And in Alaska, they issued a stop work order to the owner because the state did not meet the requirements of 165A4. In this case, Mississippi did not meet the requirements of 165A2. So, yes, there is a difference. But the only difference is EPA can issue an administrative stop work order. Obviously, citizens can't do that. Citizens have to come to the court. You couldn't possibly have that happen. So that's the difference. It's a distinction without a difference. In both cases, there was a failure to meet the 165A preconditions. All right. Thank you very much.